**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EMMANUEL S. AUSTIN, Individually and On Behalf of All Others Similarly Situated, | ) ) ) **Case No.** |
| Plaintiff, | ) ) ) |
| v. | ) **CLASS ACTION COMPLAINT** ) ) |
| DIANA CONTAINERSHIPS INC., SYMEON P. PALIOS, ANDREAS MICHALOPOULOS and ANASTASIOS MARGARONIS, | ) **JURY TRIAL DEMANDED** ) ) ) ) ) |
| Defendants. | ) ) |

## CLASS ACTION COMPLAINT

Plaintiff Emmanuel S. Austin ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Diana Containerships, Inc. ("Diana" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Diana securities between

1

June 9, 2016 and October 3, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Diana Containerships Inc., through its subsidiaries, operates in the seaborne transportation industry in Greece. It owns and operates containerships, as well as focuses on containership acquisition opportunities. The Company also engages in chartering of its vessels.

3.     Founded in 2010, the Company is headquartered in Athens, Greece and its common stock trades on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "DCIX."

4.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) through his control of Diana, Symeon Palios caused Diana to sell its common shares and securities convertible into common shares to Kalani at a significant discount to market price and to file registration statements so that Kalani could resell these shares into the market; (ii) when Kalani's sales of Diana stock caused the price of Diana stock to decline, the Company would reverse split the stock, causing a certain number of outstanding shares to be merged into a single share, and thereby raise the price of Diana stock; (iii) then Diana would again sell securities to Kalani and the same pattern of transactions would ensue; (iv) Defendants failed to disclose the true purpose of the transactions and related stock issuances and reverses, to provide Diana with financing that benefited Palios and his related companies and family members and otherwise funnel money to

Company insiders; and (v) as a result of the foregoing, Diana's public statements were materially false and misleading at all relevant times.

5.    On June 9, 2016, a previously announced one-for-eight reverse stock split of Diana's common shares, par value of $0.01 per share, took effect. On June 29, 2017, Defendant Palios and his affiliates approved a reverse split shareholder proposal. The next day, Diana announced that it would be conducting a 1-for-7 reverse split. By market close on June 30, 2017, the price of Diana common stock had declined to $0.38 per share on an unadjusted basis as a direct result of Defendants' dilutive securities offerings and share issuances. This price was 86% below the closing price of the Company's shares on January 26, 2017, when the Registration Statement was first filed. By October 3, 2017, as a result of Defendants' ongoing dilutive and manipulative conduct, the price of Diana common stock had declined to close at $0.47 per share on an unadjusted basis. At this share price, Diana had a market capitalization of less than one million dollars, despite having raised millions of dollars from investors since January 2017.

6.    Unbeknownst to investors, the transactions and related stock issuances and reversals, the Reverse Split Share Issuance Scheme, were nothing more than a manipulative financing scheme designed to further enrich Palios and Kalani and their associates.

7.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

10.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). Diana's stock trades on the NASDAQ, located within this Judicial District.

11.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

12.     Plaintiff, as set forth in the attached Certification, acquired Diana securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13.     Defendant Diana is located in Athens, Greece with principal executive offices located at Pendelis 18, Palaio Faliro, Athens, Greece 17564.  Diana's shares trade on the NASDAQ under the ticker symbol "DCIX."

14.     Defendant Symeon P. Palios ("Palios") is the Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board") of Diana.

15.     Defendant Andreas Michalopoulos ("Michalopoulos") is the Chief Financial Officer ("CFO") of Diana. Michalopoulos is the son-in-law of Defendant Palios.

16.     Defendant Anastasios Margaronis ("Margaronis") is the President and a director of Diana.

17.    The Defendants referenced above in ¶¶ 14-16 are sometimes referred to herein collectively as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

18.    Diana Containerships Inc. is a global provider of shipping transportation services through its ownership of containerships. It is headquartered in Greece, but its stock trades in New York on the NASDAQ under the ticker symbol "DCIX." As of December 31, 2016, the Company's fleet consisted of 12 vessels.

19.    The Company is run by Defendant Palios, the Company's CEO and Chairman, who also owns a number of private companies, either directly or indirectly, that provide services to Diana and engage in material commercial business dealings with the Company.

20.    Defendant Palios and members of his family derive significant financial benefits from these relationships. For example, Palios owns and controls Diana Enterprises Inc. (together with its successor entity "DEI"), which provides brokerage services to Diana in exchange for an annual fee. In 2016, Diana paid more than $2 million to DEI for brokerage services. Palios also owns and controls Altair Travel Agency S.A. ("Altair"), which serves as the Company's travel agent. The Company has paid Altair approximately $1 million per year from 2014 to 2016.

21.    In addition, Defendant Palios founded a company, Diana Shipping Services S.A. ("DSS"), that provided commercial, technical, accounting, administrative, financial reporting and other services to Diana in exchange for various fees. In March 2013, the services provided by DSS to Diana were taken over by Unitized Ocean Transport Limited ("UOT"), a wholly-owned subsidiary of Diana. UOT is headed by Defendant Palios's daughter, Semiramis Paliou. In exchange for its services, Diana pays UOT commissions equal to 2% of gross revenues, a fixed

management fee of $15,000 per month for each vessel in operation, a fixed monthly fee of $7,500 for laid-up vessels, and a $10,000 per month administrative fee. Because Diana characterizes the fees as "intercompany transactions," it eliminates them from the Company's financial statements.

22.     Diana also has a sister Company, Diana Shipping Inc. ("DSI"), that specializes in the transport of dry bulk goods. Defendant Palios serves as the CEO and Chairman of DSI. He was also that company's largest shareholder, with beneficial ownership of approximately 22.7% of DSI's common stock as of February 17, 2017. As a result of his corporate positions, his influence over DSI's board of directors and his share ownership, Palios effectively controlled DSI's actions throughout the Class Period. DSI, in turn, was the Company's largest shareholder around the start of the Class Period, owning approximately 25.7% of Diana's outstanding common stock as of February 16, 2017. In addition, DSI also has control and influence over Diana because the CEO, President, CFO and Chief Operating Officer are the same for the two companies. As a result of the ownership of Diana shares by DSI and Defendant Palios, the Company's SEC filings stated that they "will continue to be able to exercise considerable influence over our decisions" "even though the amount held by each such shareholder represents less than 50% of our voting power."

23.     Defendant Palios received fees and payments from DSI similar to those he received from Diana through various businesses that he owns and controls that provide services to DSI. For example, DSS provides commercial, technical, administrative and management services to DSI in exchange for various fees and commissions. In May 2013, Diana also took out a $50 million loan from DSI to fund vessel acquisitions and for general corporate purposes,

which has been subsequently amended and for which Diana owes various interest fees and expenses to DSI.

## Defendants' Scheme and Fraudulent Course Of Conduct

24.     As detailed herein, Defendant Palios caused Diana to engage in a series of manipulative share issuance/sales transactions with Kalani and related entities. The manipulative scheme (hereinafter referred to as the "Reverse Split Share Issuance Scheme") worked as follows: Through his control of Diana, Palios caused Diana to sell its common shares and securities convertible into common shares to Kalani at a significant discount to market price and to file registration statements so that Kalani could resell these shares into the market. When Kalani's sales of Diana stock caused the price of Diana stock to decline, the Company would reverse split the stock, causing a certain number of outstanding shares to be merged into a single share, and thereby raise the price of Diana stock. Then Diana would again sell securities to Kalani and the same pattern of transactions would ensue.

25.     At the same time that Diana was engaging in these transactions, Defendants failed to disclose the true purpose of the transactions and related stock issuances and reverses – to provide Diana with financing that benefited Palios and his related companies and family members and otherwise funnel money to Company insiders. In other words, unbeknownst to investors, the transactions and related stock issuances and reversals – the Reverse Split Share Issuance Scheme – were nothing more than a manipulative financing scheme designed to further enrich Palios and Kalani and their associates.

## Materially False and Misleading Statements Issued During the Class Period

26.     The Class Period begins on June 9, 2016, when Diana's previously announced one-for-eight reverse stock split of the common shares, par value of $0.01 per share, took effect.

27.    On July 27, 2016, Diana filed a Report on Form 6-K with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2016 (the "2Q 2016 6-K").  The Company posted a net loss of $8.01 million and time charter revenues of $8.0 million for the second quarter.

28.    On January 26, 2017, the Company filed a shelf registration statement signed by Defendants Palios, Margaronis and Michalopoulos on Form F-3 for the sale of $250 million worth of Company securities (together with its prospectus, the "Registration Statement").

29.    The Registration Statement contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein under the rules and regulations regarding its preparation. For example, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(1) ("Item 303"), requires that the Registration Statement "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." Defendants failed to disclose their fraudulent scheme to manipulate the price of Diana common stock through a series of securities offerings and reverse stock splits in order to enrich themselves at Diana's shareholders' expense. Moreover, the scheme needed to be disclosed under Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503(c) ("Item 503"), in the "'Risk factors'" section of the Registration Statement because the manipulative scheme was one of "the most significant factors that make the offering speculative or risky." Indeed, the scheme would ultimately result in shareholders losing more than 99% of the value of their Diana shares in a matter of months.

30.    In addition, the Registration Statement misleadingly stated that the Company *"may"* issue additional shares, which would have the effect of diluting the interest of existing

shareholders, but failed to disclose that the Registration Statement represented a critical step in Defendants' scheme to issue more than *100 times* the number of shares outstanding as of the date of the Registration Statement, which, as Defendants knew but failed to disclose, or were reckless in not knowing, was *certain* to dilute the interest of existing shareholders and render their shares essentially worthless.

31.    On February 16, 2017, Diana filed its annual report for the year ended December 31, 2016 on Form 20-F, which was signed by Defendant Michalopoulos (the "2016 20-F"). The Company posted a net loss of $8.5 million and time charter revenues of $5.4 million for the fourth quarter. The 2016 20-F, like the Registration Statement, misleadingly provided a boilerplate risk disclosure that share dilution and share price depreciation *"may"* occur if new securities were issued by the Company, but omitted the specific fact that Defendants had already embarked on the Reverse Split Share Issuance Scheme by filing the Registration Statement – a scheme that was certain to effectively wipe out existing shareholders and that was designed to enrich Palios and the Kalani Defendants and their associates. This fact also needed to be disclosed under Item 303 for the reasons stated in ¶ 29.

32.    The Registration Statement was declared effective on March 7, 2017. On March 21, 2017, the Company filed a prospectus supplement to the Registration Statement on Form 424B5 for the issuance and sale of 3,000 Series B-1 Convertible Preferred Shares (the "B-1 Shares"), common stock underlying the B-1 Shares, and warrants to purchase 6,500 B-1 Shares (the "B-1 Warrants"), as well as the B-1 Shares and common stock underlying such warrants (together with the Registration Statement, the "March 2017 Prospectus Supplement"). The Company was to receive $3 million for the sale of the B-1 Shares and an additional $6.5 million if the B-1 Warrants were exercised from Kalani. The March 2017 Prospectus Supplement

contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein under the rules and regulations regarding its preparation. For example, Item 303 required the March 2017 Prospectus Supplement to "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." Defendants failed to disclose their fraudulent scheme to manipulate the price of Diana common stock through a series of securities offerings and reverse stock splits in order to enrich themselves at Diana's shareholders' expense. Moreover, the scheme needed to be disclosed under Item 503 in the "'Risk Factors'" section of the March 2017 Prospectus Supplement because the manipulative scheme was one of "the most significant factors that make the offering speculative or risky." Indeed, the scheme would ultimately result in shareholders losing more than 99% of the value of the shares purchased in the offering in a matter of months.

33. The March 2017 Prospectus Supplement described a securities purchase agreement between Kalani and Diana by which the Company would sell to Kalani its common shares at a substantial discount to market price pursuant to a convoluted, variable formula, the details of which left much to the undisclosed discretion of Kalani and Company insiders and which was designed to allow Defendants to obscure the true magnitude of the potential dilution and risk of economic loss to the Company's outside shareholders (the "Securities Purchase Agreement"). Over the next several weeks, Kalani, in turn, sold its newly acquired shares to the investing public, thereby acting as an underwriter and distributor of the shares sold, and further diluting the interests of Diana common shareholders and causing a decline in the price of Diana common stock. The following excerpt from the March 2017 Prospectus Supplement illustrates

some aspects of the formula by which the number of shares issued to Kalani would be calculated under the Securities Purchase Agreement:

> The Series B-1 Convertible Preferred Shares are convertible at the option of the holder into common shares at a fixed conversion price of $7.00 per common share, subject to certain adjustments, and provided that on the date of conversion the trading volume of our common shares on The Nasdaq Global Select Market is not less than 15,000,000 shares. Alternatively, at the option of the holder, the Series B-1 Convertible Preferred Shares may be converted at a price equal to the higher of (i) 92.25% of the lowest volume-weighted average price of the common shares on any trading day during the five consecutive trading day period ending and including the trading day immediately prior to the date of the applicable conversion date, and (ii) $0.50. . . . The Series B-1 Preferred Warrants will be exercisable immediately at an exercise price of $1,000 per Series B-1 Convertible Preferred Share, and shall expire two years after the date of issuance of such warrants.

34.    The March 2017 Prospectus Supplement represented that the default "fixed" conversion price of the B-1 Shares was ***$7 per share*** – a more than 200% premium over the shares' then-current unadjusted trading price, which gave the false and misleading impression that the Company's common shares could appreciate to this price or had intrinsic value approximating this price. While the "alternative" price of 92.25% of the lowest volume-weighted average over the preceding five trading days had a nominal floor of $0.50 per share, a review of the Securities Purchase Agreement and related documents governing the sale of the B-1 Shares to Kalani indicates that even this "floor" price was illusory. As reflected in the statement of designations, preferences and rights of the B-1 Shares, "The Company ***may at any time*** any Preferred Shares remain outstanding, with the prior written consent of the Required Holders, ***reduce the then current Conversion Price to any amount*** and for any period of time deemed appropriate by the Board of Directors." The ability of the Company and Kalani to agree to sell the shares at an even lower price than the floor price was not discussed in the March 2017 Prospectus Supplement. Instead, it simply mentioned other documents containing these important terms, which were buried among other convoluted aspects of the Securities Purchase

Agreement, while the March 2017 Prospectus Supplement misleadingly touted the token $7 per share conversion price. This was done in order to conceal the true effects of the Reverse Split Share Issuance Scheme, which, as Defendants knew but failed to disclose, or were reckless in not knowing, was certain to effectively dilute the interest of existing shareholders and destroy more than 99% of shareholder value.

35.    On March 22, 2017, Diana issued a press release regarding the Company's agreement with Kalani. In addition to the sale of B-1 Shares and B-1 Warrants, the press release stated that Diana planned to sell up to an additional $140.5 million worth of Series B-2 Preferred Warrants for total proceeds of up to $150 million. The press release stated that "[t]he Company intends to use the net proceeds from the sale of the offered securities for general corporate purposes and/or to repay indebtedness under one or more of our existing credit facilities, although the Company has no present agreements to do so." The press release also stated that, "[a]part from the transaction described in this press release, the Company is not aware of any other news that would result in the increased trading activity of its stock or a fluctuation of its stock price."

36.    On March 24, 2017, the Company filed a registration statement on Form F-3, signed by Defendants Palios, Margaronis and Michalopoulos, for the issuance and sale of $140.5 million worth of outstanding warrants (the "B-2 Warrants") to purchase Series B-2 Convertible Preferred Shares (the "B-2 Shares") (together with its prospectus, the "B-2 Registration Statement"), which warrants had been sold earlier to Kalani in a private placement. The B-2 Registration Statement, like the Registration Statement, misleadingly provided a boilerplate risk disclosure that share dilution and share price depreciation "may" occur if new securities were issued by the Company, but omitted the specific fact that Defendants had already embarked on

the Reverse Split Share Issuance Scheme by filing the Registration Statement – a scheme that was certain to effectively wipe out existing shareholders and that was designed to enrich Palios and the Kalani Defendants and their associates. This fact also needed to be disclosed under Items 503 and 303 for the reasons stated in ¶ 29.

37.     In addition, as with the B-1 Shares and B-1 Warrants, pursuant to the Securities Purchase Agreement, the Company would use the B-2 Shares and B-2 Warrants to sell to Kalani its common shares at a substantial discount to market price pursuant to a convoluted, variable formula, the details of which left much to the undisclosed discretion of Kalani and Company insiders and which was designed to allow Defendants to obscure the true magnitude of the potential dilution and risk of economic loss to the Company's outside shareholders. As with the March 2017 Prospectus Supplement, the B-2 Registration Statement misleadingly touted the $7 per share "fixed" conversion price and illusory floor price of $0.50 per share. As reflected in the statement of designations, preferences and rights of the B-2 Shares, however, "The Company may at any time any Preferred Shares remain outstanding, with the prior written consent of the Required Holders, reduce the then current Conversion Price to any amount and for any period of time deemed appropriate by the Board of Directors." The ability of the Company and Kalani to agree to sell the shares at an even lower price than the floor price was not discussed in the B-2 Registration Statement. Instead, it simply mentioned other documents containing these important terms, which were buried among other convoluted aspects of the Securities Purchase Agreement, while misleadingly touting the token $7 per share conversion price. This was done in order to conceal the true effects of the Reverse Split Share Issuance Scheme, which, as Defendants knew but failed to disclose, or were reckless in not knowing, was certain to effectively dilute the interest of existing shareholders and destroy more than 99% of shareholder value.

38.    On March 29, 2017, the Company filed a notice of annual meeting of shareholders on Form 6-K, which was signed by Defendant Margaronis. The notice stated that the meeting would be held on May 10, 2017. Among the proposals up for a shareholder vote was a proposal to approve an amendment to Diana's Articles of Incorporation to allow up to 1-for-1000 share reverse splits. The Form 6-K stated that the "purpose of a reverse stock split is to increase the per share trading value of the Company's Common Shares," and further assured investors that Diana's "Board intends to effect one or more reverse stock splits only if it believes that a decrease in the number of Common Shares outstanding is likely to improve the trading price for the Company's Common Shares, and only if the implementation of a reverse stock split is determined by the Board to be in the best interests of the Company and its shareholders." These statements were materially false and misleading when made because, as Defendants knew but failed to disclose, or were reckless in not knowing, the true purpose of the proposal was to further Defendants' Reverse Spilt Share Issuance Scheme and enable Diana to funnel the proceeds of securities sales to Kalani to Company insiders. In addition, Defendants knew, but failed to disclose, that they intended to repeatedly engage in stock issuances and related reverse splits, thereby manipulating the market for Diana stock.

39.    The B-2 Registration Statement was declared effective on May 11, 2017. The next day, the Company filed a report on Form 6-K stating that its annual shareholder meeting originally scheduled for May 10, 2017 had been adjourned until May 19, 2017 "to allow additional time for the solicitation of proxies," including the reverse split proxy proposal described in ¶ 38.

40.     On May 22, 2017, Diana issued a press release announcing its financial results for the first quarter ended March 31, 2017. The Company reported a net loss of $7.4 million and time charter revenues of $3.8 million for the quarter.

41.     That same day, the Company held an earnings conference call to discuss the results, which was attended by the Diana Officer Defendants. During the call, these Defendants made numerous representations that the container shipping business was in recovery and that Diana would be able to take advantage of emerging opportunities as a result of its Securities Purchase Agreement with Kalani. For example, in reference to the Securities Purchase Agreement, Defendant Palios stated: "Diana Containerships has taken action to reinforce our financial strength and to operate our business to navigate the current phase of the industry cycle." Similarly, Defendant Margaronis stated that "[t]he containership sector finally showed signs of recovery across the whole 5 ranges during the first quarter of this year." He continued in pertinent part:

> **With the actions put in place by the senior management of Diana Containerships**, we are hopeful that the market upturn, **when it comes in earnest, will find a company with a very robust balance sheet. This will make it possible to take advantage of opportunities which will undoubtedly present themselves** as they always do at the end of a prolonged downturn, similar to what this industry has gone through over the last few years.

42.     Defendants knew, or were reckless in not knowing, that the statements in ¶ 41 misrepresented and/or omitted material facts necessary to make the statements made, at the time made and in light of the circumstances under which they were made, not misleading. Specifically, Defendants failed to disclose that the Reverse Split Share Issuance Scheme would effectively wipe out the Company's existing shareholders and critically impair the Company's ability to raise additional capital, operate as a going concern, or otherwise participate in any broader recovery in the containership market.

43.     On May 24, 2017, the Company filed a report on Form 6-K stating that the Company's proxy proposal to allow for additional reverse splits describe in ¶ 38 was again adjourned until June 29, 2017 to allow time to solicit proxy proposals. Notably, this proposal required the affirmative vote of the holders of a majority of all outstanding shares eligible to attend and vote at the meeting.

44.     On June 6, 2017, the Company filed a report on Form 6-K stating that it had issued 100 shares of newly designated Series C Preferred Stock (the "Series C Shares") to Diana's sister company DSI, which was effectively controlled by Defendant Palios and his affiliates, in exchange for a $3 million reduction of the principal amount of the Company's loan outstanding from DSI. Each Series C Share entitled the holder thereof to up to 250,000 votes. Although DSI's voting power was capped at 49%, because of Defendant Palios's independent ownership of Diana common stock, this financial maneuver effectively gave him voting control of the Company with minimal exposure to the downside risks facing the Company's outside common shareholders. In sum, while Diana represented that it had adjourned the regularly scheduled shareholder meeting to provide time to solicit additional proxies for the reverse split proposal, in truth it had simply done so in order to allow Defendant Palios and his associates time to obtain voting control of the Company so as to ensure the outcome of the vote to approve the reverse split proxy proposal and further the Reverse Split Share Issuance Scheme.

45.     On June 29, 2017, Defendant Palios and his affiliates used their newly obtained voting control of the Company to approve the reverse split shareholder proposal. The next day, Diana announced that it would be conducting a 1-for-7 reverse split.

46.     By market close on June 30, 2017, the price of Diana common stock had declined to $0.38 per share on an unadjusted basis as a direct result of Defendants' dilutive securities

offerings and share issuances. This price was 86% below the closing price of the Company's shares on January 26, 2017, when the Registration Statement was first filed. During this same time frame, the number of Company shares outstanding had grown from approximately 9.4 million shares to 14.4 million shares, an increase of more than 53%. As result of the 1-for-7 reverse split, the number of Diana's outstanding common shares declined from approximately 14.4 million shares to approximately 2.1 million shares, which began trading on a split-adjusted basis on July 5, 2017. The reverse stock split resulted in a temporary increase in the unadjusted share price of Diana common stock from a close of $0.28 per share on July 3, 2017 to a close of $1.42 per share on July 5, 2017, the next trading day. However, this increase did not offset the loss in value to shareholders from having their shares merged, and the price of the shares actually declined over 27% on an adjusted basis.

47.     On July 25, 2017, Diana issued a press release announcing its financial results for the second quarter ended June 30, 2017. The Company reported net income of $36.5 million and time charter revenues of $5.5 million for the quarter. The net income results included a one-time net gain of $42.2 million from a debt write-off related to the refinancing of a Diana loan.

48.     That same day, the Company held an earnings conference call to discuss the results, which was attended by the Diana Officer Defendants. During the call, these Defendants again made numerous representations that the container shipping business was in recovery, which Diana would be able to take advantage of as a result of its recent financing activities. For example, Defendant Palios stated: "Second quarter was highlighted by financing transactions that have significantly strengthened the company's balance sheet and has [sic] also provided additional flexibility to take advantage of an eventual improvement in market conditions in the containership segment." Similarly, Defendant Margaronis stated in pertinent part:

Putting the general tendency for recalibration alongside improving fundamentals and market conditions, the foundations for lasting improvement to the market environment are at last starting to appear. As our Chairman and CEO mentioned earlier on, there has been a dramatic improvement in the company's balance sheet this quarter coming from the recent buyout of Royal Bank of Scotland loan facility. Senior management realizes that more capital will be needed over the next few quarters to repay short and medium-term debt and enable the company to take advantage of opportunities, which may from time to time arise in our sector.

49.    Defendants knew, or were reckless in not knowing, that the statements in ¶ 48 misrepresented and/or omitted material facts necessary to make the statements made, at the time made and in light of the circumstances under which they were made, not misleading. Specifically, Defendants failed to disclose that the Reverse Split Share Issuance Scheme would effectively wipe out the Company's existing shareholders and critically impair the Company's ability to raise additional capital, operate as a going concern, or otherwise participate in any broader recovery of the containership market.

50.    By market close on July 26, 2017, the price of Diana common stock had declined to $0.19 per share on an unadjusted basis as a direct result of Defendants' dilutive securities offerings and share issuances. This price was 87% below the closing price of the Company's shares on July 5, 2017, after the Company's previously announced 1-for-7 reverse stock split took effect. During this same time frame, the number of Company shares outstanding had ballooned from approximately 2.1 million shares to 6.1 million shares, an increase of more than 190%.

51.    Also on July 26, 2017, Diana filed a report on Form 6-K stating that it would effect a 1-for-6 reverse stock split of the Company's common shares. This reduced the number of Diana's outstanding common shares from approximately 6.1 million shares to approximately 1 million shares, which began trading on a split-adjusted basis on July 27, 2017. The reverse stock split resulted in a temporary increase in the unadjusted share price of Diana common stock from

a close of $0.19 per share on July 26, 2017 to a close of $0.83 per share on July 27, 2017. However, this increase did not offset the loss in value to shareholders from having their shares merged, and the price of the shares actually declined over 27% on an adjusted basis.

52. The statements referenced above were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) through his control of Diana, Symeon Palios caused Diana to sell its common shares and securities convertible into common shares to Kalani at a significant discount to market price and to file registration statements so that Kalani could resell these shares into the market; (ii) when Kalani's sales of Diana stock caused the price of Diana stock to decline, the Company would reverse split the stock, causing a certain number of outstanding shares to be merged into a single share, and thereby raise the price of Diana stock; (iii) then Diana would again sell securities to Kalani and the same pattern of transactions would ensue; (iv) Defendants failed to disclose the true purpose of the transactions and related stock issuances and reverses, to provide Diana with financing that benefited Palios and his related companies and family members and otherwise funnel money to Company insiders; and (v) as a result of the foregoing, Diana's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

53. On July 31, 2017, DSI filed a report on Form SC 13D/A disclosing that it had sold over 90% of its Diana common shares in open market transactions between July 7 and July 14, 2017, and, as a result of these sales and the Company's share issuances under the Securities Purchase Agreement, had retained only 0.8% of the Company's common shares as of the

reporting date. In effect, Defendant Palios had used his control and influence over DSI to exit that Company's equity stake in Diana, even as he was overseeing the issuance of millions of new shares that were being sold into the market through Kalani.

54.    By market close on August 23, 2017, the price of Diana common stock had declined to $0.26 per share on an unadjusted basis as a direct result of Defendants' dilutive securities offerings and share issuances. This price was 69% below the closing price of the Company's shares on July 27, 2017, after the Company's previously announced 1-for-6 reverse stock split took effect. During this same time frame, the number of Company shares outstanding had ballooned from approximately 1 million shares to 5.3 million shares, an increase of approximately 430%.

55.    Also on August 23, 2017, Diana filed a report on Form 6-K stating that it would effect a 1-for-7 reverse stock split of the Company's common shares. This reduced the number of Diana's outstanding common shares from approximately 5.3 million shares to approximately 0.8 million shares, which began trading on a split-adjusted basis on August 24, 2017. The reverse stock split resulted in a temporary increase in the unadjusted share price of Diana common stock from a close of $0.26 per share on August 23, 2017 to a close of $1.15 per share on August 24, 2017. However, this increase did not offset the loss in value to shareholders from having their shares merged, and the price of the shares actually declined 37% on an adjusted basis.

56.    On September 8, 2017, Diana filed a report on its financial condition and its results of operations for the six months ended June 30, 2017 on Form 6-K (the "1H17 6-K"). The 1H17 6-K revealed that, even as the Company's time charter revenues had plummeted from approximately $22.5 million in the first six months of fiscal 2016 to approximately $9.3 million in the first six months of fiscal 2017 (a decline of over 58%), Defendant Palios had continued to

reap considerable financial benefits from his ownership of related companies. For example, Altair and DEI collectively received over $1 million in fees, expenses and bonuses paid by Diana during this time period.

57.    By market close on September 22, 2017, the price of Diana common stock had declined to $0.42 per share on an unadjusted basis as a direct result of Defendants' dilutive securities offerings and share issuances. This price was 63% below the closing price of the Company's shares on August 24, 2017, after the Company's previously announced 1-for-7 reverse stock split took effect. During this same time frame, the number of Company shares outstanding had ballooned from approximately 0.8 million shares to 3.2 million shares, an increase of approximately 300%.

58.    Also on September 22, 2017, Diana filed a report on Form 6-K stating that it would effect a 1-for-3 reverse stock split of the Company's common shares. This reduced the number of Diana's outstanding common shares from approximately 3.2 million shares to approximately 1.1 million shares, which began trading on a split-adjusted basis on September 25, 2017. The reverse stock split resulted in a temporary increase in the unadjusted share price of Diana common stock from a close of $0.42 per share on September 22, 2017 to a close of $0.74 per share on September 25, 2017, the next trading day. However, this increase did not offset the loss in value to shareholders from having their shares merged, and the price of the shares actually declined 41% on an adjusted basis.

59.    By October 3, 2017, as a result of Defendants' ongoing dilutive and manipulative conduct, the price of Diana common stock had declined to close at $0.47 per share on an unadjusted basis. At this share price, Diana had a market capitalization of less than one million dollars, despite having raised millions of dollars from investors since January 2017. This

shocking erosion in shareholder value was the direct result of Defendants' fraudulent scheme to manipulate the price of Diana common stock and to induce purchases through the series of dilutive and manipulative stock offerings and reverse stock splits detailed herein.

60.     The following example illustrates the extent to which Defendants' conduct has manipulated the market for Diana common shares: If a shareholder held the entirety of the 9.4 million shares of Diana common stock outstanding as of January 26, 2017 – the date of the Registration Statement – this same shareholder, if he or she engaged in no other transactions, would own less than 10,700 shares following the September 25, 2017 1-for-3 reverse stock split, a decline of more than 99%. Similarly, on an adjusted basis, Diana common stock traded at a price of more than $2,500 per share during the early part of the Class Period – stock which was worth only $0.47 per share on an adjusted basis as of October 3, 2017 – meaning shareholders have been effectively wiped out.

61.     While shareholders have lost millions of dollars, Palios and the Kalani Defendants and their affiliates have been enriched. Palios has earned hundreds of thousands of dollars through self-dealing, as offering proceeds have been used by the Company to pay companies that he owns and controls. Similarly, Kalani has made hundreds of thousands of dollars in commissions, fees and profits from its resale to the investing public of the discounted Diana common stock it purchased in the securities offerings.

62.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

63.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Diana securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

64.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Diana securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Diana or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

65.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

66.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

67.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Diana;

- whether the Individual Defendants caused Diana to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Diana securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

68.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

69.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

24

- Diana securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Diana securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

70. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

71. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

72. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

73. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

74. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions,

practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Diana securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Diana securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

75.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Diana securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Diana's finances and business prospects.

76.    By virtue of their positions at Diana , Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made,

although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

77.      Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Diana, the Individual Defendants had knowledge of the details of Diana's internal affairs.

78.      The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Diana. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Diana's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Diana securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Diana's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Diana securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

79.      During the Class Period, Diana securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and

misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Diana securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Diana securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Diana securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

80.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

81.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

82.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

83.    During the Class Period, the Individual Defendants participated in the operation and management of Diana, and conducted and participated, directly and indirectly, in the conduct

of Diana's business affairs.  Because of their senior positions, they knew the adverse non-public information about Diana's misstatement of income and expenses and false financial statements.

84.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Diana's financial condition and results of operations, and to correct promptly any public statements issued by Diana which had become materially false or misleading.

85.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Diana disseminated in the marketplace during the Class Period concerning Diana's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Diana to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Diana within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Diana securities.

86.    Each of the Individual Defendants, therefore, acted as a controlling person of Diana.  By reason of their senior management positions and/or being directors of Diana, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Diana to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Diana and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

87.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Diana.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: December 15, 2017

Respectfully submitted,

**POMERANTZ LLP**
*/s/Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

### CERTIFICATION PURSUANT
### TO FEDERAL SECURITIES LAWS

1.    I, _Emmanuel Samuel Austin_____, make this

declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section

21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities

Litigation Reform Act of 1995.

2.    I have reviewed a Complaint against Diana Containerships Inc. ("Diana" or the "Company") and,

authorize the filing of a motion on my behalf for appointment as lead plaintiff.

3.    I did not purchase or acquire Diana securities at the direction of plaintiffs' counsel or in order to

participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or

acquired Diana securities during the class period, including providing testimony at deposition and trial, if

necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.    To the best of my current knowledge, the attached sheet lists all of my transactions in Diana

securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, I have not

sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the class as set

forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses

directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

Executed _____11/30/2017_____
                (Date)


_____
                (Signature)


_Emmanuel Austin_____
                (Type or Print Name)

**DIANA CONTAINERSHIPS INC. (DCIX)**                                    **Austin, Emmanuel Samuel**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES/UNITS | PRICE PER SHARES/UNITS |
|------|------------------|------------------------|------------------------|
| 1/31/2017 | Purchase | 3,624 | $2.7600 |
| 2/1/2017 | Purchase | 5,000 | $3.0500 |
| 1/31/2017 | Sale | 3,624 | $2.9000 |